# United States Court of Appeals
## For the First Circuit

No. 24-1488

ARLETA MONGUE, individually and on
behalf of all other persons similarly situated,

Plaintiff, Appellee,

v.

THE WHEATLEIGH CORPORATION; L. LINFIELD SIMON;
SUSAN SIMON; MARC WILHELM,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Katherine A. Robertson, U.S. Magistrate Judge]

Before

Gelpí and Kayatta, Circuit Judges,
and Smith,[*] District Judge.

Matthew P. Horvitz, with whom Goulston & Storrs PC was on
brief, for appellants.
Jeffrey S. Morneau, with whom Connor & Morneau, LLP was on
brief, for appellee.

January 21, 2026

---

[*] Of the District of Rhode Island, sitting by designation.

**KAYATTA**, **Circuit Judge**.  This appeal stems from a series of lawsuits -- including a class action -- brought by former employees against the Wheatleigh Hotel and its owners and operators (collectively, "Wheatleigh").   Acting on behalf of several individual employees as well as a certified class of employees, a single lawyer negotiated with Wheatleigh a global settlement resolving all of the employees' unfair wage claims.  Wheatleigh then tried to get out of the deal, claiming, among other things, that plaintiffs' counsel should not have been allowed to represent both a class and individual plaintiffs in making a settlement. As we will explain, we affirm the district court's rulings holding Wheatleigh to its deal.

## I.

The Wheatleigh Hotel was a luxury hotel and resort located in Lenox, Massachusetts.  On April 11, 2018, Mark Brown, a former guest services manager at the hotel, filed a lawsuit in the District of Massachusetts against the hotel's owner, the Wheatleigh Corporation; the corporation's president, treasurer, and director, L. Linfield Simon; its secretary and director, Susan Simon; and its general manager and director, Marc Wilhelm.  Brown alleged that he was misclassified as exempt from overtime pay and was thus owed unpaid overtime wages under the Fair Labor Standards Act (FLSA).  See 29 U.S.C. § 207.  He also alleged that Wheatleigh failed to pay him a minimum wage during certain pay periods and

that it failed to pay his wages within the time periods required by Massachusetts law. Finally, Brown brought common-law quantum meruit claims for failure to compensate him for services rendered.

On June 20, 2018, another former Wheatleigh employee, Arleta Mongue, sued the same defendants, again in the District of Massachusetts. Mongue's first amended complaint alleged among other things (1) that she was paid less than minimum wage because Wheatleigh paid her a "service rate" of $5 per hour plus a cut of a tip pool, which was inappropriate because she often performed non-tip producing tasks and because the tip pool was unlawfully shared with non-wait staff employees and supervisors; (2) that she was not paid overtime she was owed; and (3) that she was not paid for time when she was required to work during her scheduled meal breaks. Mongue also alleged that Wheatleigh failed to provide her with specific information that an employer is required to share under the FLSA and Massachusetts law before it may pay tipped employees at a rate less than minimum wage.

Shortly after Mongue's initial complaint was filed, two more Wheatleigh employees came forward: Mary Harris and Christian Hamel, who both alleged they had been denied wages under the FLSA and Massachusetts law because they had been misclassified as overtime-exempt managers. Both filed suit against Wheatleigh in July 2018. In due course, Mongue also successfully secured the certification of a class under Rule 23(b)(3) on behalf of current

- 3 -

and former Wheatleigh employees on her state-law claims. In total, Wheatleigh faced four different cases: three individual cases (Brown, Harris, and Hamel) each claiming, among other things, that plaintiffs had been misclassified as overtime-exempt, and one class action (Mongue) asserting mismanagement of the hotel's tip pool and unlawful payment of the service wage rate. In all four cases, attorney Jeffrey Morneau and his firm, Connor & Morneau, LLP, represented the plaintiffs, including the class.

A few months after the magistrate judge certified Mongue's state-claims class,[1] on December 22, 2021, Morneau sent an email to defense counsel Patrick Bannon providing a "revised demand for a global settlement of all pending cases." The email stated that "[t]he agreed upon total amount in full and final settlement is Five Hundred Eighty Thousand Dollars," and that this "Gross Settlement Fund" would be allocated as follows:

- $8,103 to Brown (1.5 times single damages)
- $11,961 to Harris (1.5 times single damages)
- $8,124 to Hamel (single damages)
- $5,000 to Mongue (individually, as a service award for being the class representative)
- $27,102 Class Tip Pool Violation ($9,034.00 x 3)
- $234,884.80 (CLASS other Violations)
- $284,825.20 (fees and costs to be allocated between the four cases as we choose)

---

[1] The parties consented to proceed before a magistrate judge. See 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

- 4 -

The email also stated that "[t]he only sum in addition to the [Gross Settlement Fund] that [Wheatleigh] shall be required to pay is the employer's share of payroll taxes on the Individual Settlement Payments . . . which are allocated to wages." And it noted that "Class Counsel may apply to the Court for an award of attorney[] fees and costs and expenses incurred in connection with the prosecution of the Litigation."

The next day, Bannon responded to Morneau by email. He stated that "[t]his email is to confirm that we've reached a global settlement on the terms stated in your email below, with two modifications." Those modifications were (1) to reduce the total Gross Settlement Fund to "$550K rather than $580K," and (2) to revert to Wheatleigh the value of any checks mailed to settlement class members that were not cashed, deposited, or otherwise negotiated by the applicable expiration date. Bannon also wrote to "make explicit three points that . . . [were] obvious and/or uncontroversial": (1) that any "award of attorney[] fees and costs and expenses" sought from the court would be paid out of the Gross Settlement Fund; (2) that Wheatleigh would get general releases from Brown, Harris, Hamel, Mongue, and may also, at its discretion, include a release of wage claims on settlement checks sent to class members such that endorsing the check constituted a release of wage claims; and (3) that all four lawsuits would be dismissed with prejudice. Bannon asked Morneau to "reply to confirm that we

- 5 -

have a deal on these terms."  Later that day, Morneau replied, "Confirmed."

Neither party disputes the authenticity of these emails. Nor do they dispute defense counsel's authority to settle the case on Wheatleigh's behalf.

Six days later, defense counsel emailed the court to confirm that all four cases against Wheatleigh had been resolved, that the parties in the individual cases would file joint motions for 45-day nisi orders, and that class counsel would follow up with the court after the New Year.[2]  On February 17, 2022, the parties filed a joint status report stating that they intended to file a motion for preliminary approval of a class-action settlement on or before March 4, 2022.  After requesting an extension, on April 5, 2022, the parties jointly requested a status conference because of "obstacles" that had emerged in finalizing settlement of the four cases.

The magistrate judge held a status conference on April 20, 2022.  Attorney Morneau identified the issue as Wheatleigh's refusal to "dismiss or settle the individual cases or the class case without . . . all of them being dismissed at the same time."  Attorney Bannon, who represented Wheatleigh, stated

---

[2]  A nisi order or decree is "[a] court's decree that will become absolute unless the adversely affected party shows the court, within a specified time, why it should be set aside." Decree nisi, Black's Law Dictionary (12th ed. 2024).

- 6 -

that his client viewed the December negotiations as reaching "a global settlement agreement," which entailed "a settlement of all four cases or . . . none," and was not comfortable with the risk that, after the individual cases settled, the court would refuse to approve the class-action settlement. To allay this concern, Wheatleigh proposed that the court approve all three individual cases alongside the class action. Morneau raised ethical concerns with such an arrangement, since it would suggest that "the Mongue [class-action] settlement [was] somehow contingent upon the other three cases being approved by this Court."

Underlying this proposal was Wheatleigh's apparent concern that the attorney fees had been unfairly apportioned. Wheatleigh's apprehension seemed to be that it might be stuck paying substantial attorney fees for the settled individual cases, which constituted a majority of the total attorney fees for all four cases, only to then have to litigate the class action should the court decline to approve the class-action settlement. Bannon also stated that one of his clients, Linfield Simon, who was "not a current member of the bar" but "formerly practiced as a lawyer," had insisted that he present a declaration to the court that "lays out what [Simon] sees as substantial concerns about the aggregate settlement and whether that's proper or not."

The court orally reassured the parties that it was likely to approve the class-action settlement based on the relevant

factors as it understood them. It also gave Wheatleigh permission to file something under seal indicating the settlement amounts and stating that its agreement to settle the individual cases was contingent on the court's approval of the class-action settlement. The parties also tentatively agreed, at the court's suggestion, to wait for approval of the class-action settlement before signing the individual settlement agreements. The court explained that it was "sensitive" to Linfield Simon's concern, but that its understanding was "that there was a settlement agreement reached" as to "all four cases" and that "the only contingency that might hold up the settlement agreement is the Court's denial of approval to the class action, and as long as the Court has not denied its approval of a class settlement, this is a binding agreement."

After the status conference, Wheatleigh finalized and executed separate settlement agreements to resolve the Brown, Hamel, and Harris lawsuits. Those settlement agreements specified that the attorney fee amounts for each individual case would be contingent on the court's final approval of the Mongue class-action settlement. On May 6, 2022, the Brown, Hamel, and Harris cases were dismissed with prejudice by stipulation of the parties.

On May 11, 2022, Wheatleigh filed a "Status Report and Request for Court Guidance," along with a declaration by Linfield Simon concerning his views on the settlement agreement. The magistrate judge responded to these submissions by (1) directing

plaintiffs' counsel to file a motion to enforce the parties' settlement order to the extent that there was a basis for doing so; (2) reminding defense counsel that the court could not give advice, and its role was limited to ruling on pending motions after both sides had the opportunity to be heard; (3) directing defense counsel to the rules for withdrawing representation; and (4) informing Wheatleigh that, so long as it was represented by counsel, the court would only review or rule on documents filed by counsel on its behalf. On May 25, 2022, and June 7, 2022, Wheatleigh's four attorneys moved to withdraw from their representation of Wheatleigh, and new defense counsel entered their notices of appearance on June 7, 2022. Mongue filed a motion to enforce the class-action settlement on June 3, 2022.

After considering Wheatleigh's opposition to Mongue's motion to enforce the settlement agreement and holding a hearing on the topic, the magistrate judge granted the motion to enforce the settlement agreement but denied Mongue's requested award of fees in connection with that enforcement motion. After briefing and a hearing on Mongue's subsequent preliminary-approval motion, the court issued an order preliminarily approving the settlement "as reflected in the parties' December 22, 2021 and December 23, 2021 emails." On October 19, 2023, Mongue moved for attorney fees, expenses, and a service award, and, on November 9, 2023, Mongue moved for final approval of the class-action settlement;

Wheatleigh opposed both motions. As to attorney fees, Wheatleigh argued that the fees represented too much of the Global Settlement Fund and included fees for work done by an undisclosed co-counsel. As to final approval, Wheatleigh argued principally that class counsel could not adequately represent the class due to inherent conflicts arising from his representation of both individual plaintiffs and the class. The court held a fairness hearing on the class-action settlement on December 7, 2023.

On April 16, 2024, the court granted final approval to the class-action settlement and to Mongue's motion for attorney fees, expenses, and a service award for the named plaintiff. It issued a final judgment ordering Wheatleigh to pay a total of $365,989.47 to a class including "all individuals who worked as wait staff employees, service employees, or service bartenders for [Wheatleigh] from May 7, 2017 to March 1, 2020, and were paid a Service Rate." This appeal followed.

**II.**

Wheatleigh first argues that the district court erred by failing to recognize that Mongue lacked Article III standing.

"The existence vel non of standing is a legal question and, therefore, engenders de novo review." Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 283 (1st Cir. 2006). "[N]amed plaintiffs need to satisfy [Article III standing] throughout the stages of the litigation." In re Nexium

Antitrust Litig., 777 F.3d 9, 31-32 (1st Cir. 2015). Because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case," each of those elements "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

Wheatleigh contends that the evidence shows "Mongue received sufficient compensation to satisfy minimum wage requirements" during her employment, and that, as a result, she has suffered only an "informational injury" insufficient for standing. But the sole record citation Wheatleigh points us to refers to a spreadsheet indicating that Mongue suffered $7,023.43 in damages, including unpaid overtime. The district court concluded that this monetary harm was sufficient for standing. Wheatleigh fails to explain how this spreadsheet demonstrates that Mongue actually received pay equal to or more than the minimum wage throughout her employment and points to nothing else in the record to support this contention. Nor do we see any evidence for Wheatleigh's assertion that the $7,023.43 in damages alleged by Mongue is for the hotel's alleged failure to provide the notice required under federal and state law, rather than for lost wages. Indeed, this number was apparently calculated based on the

differential between the rates that were paid and that should have been paid under Massachusetts law.

To the extent that Wheatleigh disputes Mongue's damages calculations, that is a factual merits issue that would properly have been litigated prior to Wheatleigh's agreement to settle.[3] Similarly, Wheatleigh's concerns about alleged "substantive deficiencies" with the Mongue's notice claim -- which go to the merits, not to standing -- should also have been litigated prior to settlement. As such, we see no error in the district court's conclusion that Mongue has sufficiently alleged Article III standing.[4]

---

[3] Wheatleigh argues that its agreement to settle did not waive any of its arguments on appeal. Wheatleigh points to Robinson v. National Student Clearinghouse for the proposition that the approval of a class-action settlement may be appealed. 14 F.4th 56, 60 (1st Cir. 2021). True enough. But appealing the approval of a settlement -- e.g., was the relief provided adequate? -- is not the same as litigating the underlying merits of settled claims on appeal.

Wheatleigh also argues that it did not waive any defenses or arguments through its agreement to settle because it did not expressly waive them in the December 2021 emails. This too is unconvincing. Wheatleigh cites to Pinto v. Aberthaw Construction Co., where the parties "agreed to waive all rights of appeal." 637 N.E.2d 219, 221 n.2 (Mass. 1994). Wheatleigh argues that this implies waiver must be express. But, at least in ordinary course, the very purpose of resolving a lawsuit by settlement is to preclude further litigation, by appeal or otherwise. The fact that a party in some cases decides to make this obvious point express does not mean that others must do so as well.

[4] We do not opine on whether Wheatleigh's alleged failure to provide statutorily required notice of a tip pool and credit is, absent other damages, sufficient to create an injury-in-fact.

**III.**

Wheatleigh next challenges the district court's enforcement of the global settlement as reflected in the December 2021 emails and approval of the class-action settlement included therein. Wheatleigh does not dispute that the negotiations with plaintiffs' counsel culminated in a meeting of the minds resolving all four lawsuits on agreed-upon terms. Wheatleigh argues instead that the agreed-upon resolution -- styled as a "global settlement" -- (1) was not the same as that enforced and approved by the court, (2) was unenforceable on public policy grounds, and (3) was contingent on a class-action settlement which should not have been approved as a matter of law.

**A.**

"The district court's determination that an enforceable settlement agreement existed is a mixed question of fact and law, which we review on 'a sliding scale standard of review under the label of clear error review.'" Fid. & Guar. Ins. Co. v. Star Equip. Corp., 541 F.3d 1, 5 (1st Cir. 2008) (quoting Quint v. A.E. Staley Mfg. Co., 246 F.3d 11, 14 (1st Cir. 2001)). "The more the district court's conclusions are characterized as factual conclusions, the more our review of those facts is for clear error; the more the district court's conclusions are conclusions of law, the more independent review we give." Quint, 246 F.3d at 14.

**i.**

Wheatleigh first contends that the district court erred by splitting the "global settlement" reflected in the December 2021 emails into four discrete agreements. Essentially, Wheatleigh argues that the district court enforced an agreement that never existed because the actual agreement reached was for one global settlement, not four discrete settlements. So, Wheatleigh argues, since the three individual cases had been settled separately, no agreement remained for the court to enforce.

The district court clearly treated the disposition of all four lawsuits as interdependent. It authorized Wheatleigh to file a document under seal making clear that the settlement was global and specifying the amount agreed upon for each of the respective cases and found that the Harris, Brown, and Hamel settlement agreements were agreements required to be identified under Rule 23(e)(3). To the extent Wheatleigh argues that "global settlement of all cases" can only mean a single settlement document, submitted to the court for review and approval, it offers no legal support for that interpretation. Nor does Wheatleigh's argument make any sense. An agreement to settle four lawsuits as a package in ordinary course would anticipate entering four judgments, one in each suit. This is what the court did. In short, Wheatleigh got exactly what it agreed to -- the disposition of all four lawsuits for the agreed-upon amount.

- 14 -

Wheatleigh next contends that the district court erred in finding that the December 2021 emails constituted an enforceable agreement. Wheatleigh seems to argue that the agreement is void as against public policy because the court would breach its fiduciary duty to unnamed class members if it enforced an agreement allegedly marred by class counsel's conflicts. Below, Wheatleigh based this argument on the principle that "[a] promise by a fiduciary to violate his fiduciary duty or a promise that tends to induce such a violation is unenforceable on grounds of public policy." Restatement (Second) of Contracts § 193 (A.L.I. 1981). The district court declined to address this argument in its order enforcing the settlement agreement, finding that the fairness of the settlement to absent class members should be carefully addressed through the Rule 23(e) review of the class-action settlement at the subsequent approval stage, rather than the earlier enforcement stage.

Wheatleigh's argument on this point is likely waived given the perfunctory presentation of this argument on appeal. See Rodriguez v. Municipality of San Juan, 659 F.3d 168, 176 (1st Cir. 2011) (finding waiver when an appellant "provide[d] neither the necessary caselaw nor reasoned analysis to show that he is right about any of [his arguments]"). Even proceeding to the merits, we find this argument unconvincing. It is true that the

district court has a "responsibility to monitor class counsel's performance" because "class actions are rife with potential conflicts of interest." In re Pharm. Indus. Average Wholesale Price Litig., 588 F.3d 24, 36 (1st Cir. 2009) (cleaned up). And this responsibility has been described as including "a fiduciary duty to absent members of the class." In re Lupron Mktg. & Sales Pracs. Litig., 228 F.R.D. 75, 93 (D. Mass. 2005). But Wheatleigh does not explain how a court would breach any such duty by enforcing a settlement agreement contingent on a later evaluation of any fairness concerns at the approval stage, as the district court did here. This argument thus collapses into our analysis of the district court's approval of the class-action settlement, which we turn to next.

**B.**

Wheatleigh's challenge to the approval of the class-action settlement -- and thus to the enforcement of the global settlement -- trains our attention on the requirement under Rule 23 that the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Although Wheatleigh's full argument is not entirely clear, we understand it to be that, because the same lawyer represented individual plaintiffs and the class, he could not adequately and fairly negotiate an agreement on behalf of the class.

We have explained that "the district court enjoys considerable range in approving or disapproving a class action settlement, given the generality of the standard and the need to balance the settlement's benefits and costs." Robinson v. Nat'l Student Clearinghouse, 14 F.4th 56, 59 (1st Cir. 2021) (cleaned up). We accordingly review for "for abuse of that discretion -- a multifaceted standard under which we scrutinize embedded legal issues de novo and factual findings for clear error." Cohen v. Brown Univ., 16 F.4th 935, 944 (1st Cir. 2021).

Fair and adequate representation by the class representative generally requires the appointment of class counsel. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 626 n.20 ("The adequacy heading also factors in competency and conflicts of class counsel."). Rule 23(g) sets forth the considerations attendant to appointing class counsel. Fed. R. Civ. P. 23(g). While Rule 23(g) makes no mention of counsel conflicts, it does allow for consideration of any "matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Id. 23(g)(1)(B). And when dealing with motions to approve a class-action settlement, the reviewing court must find that counsel has indeed "adequately represented the class." Id. 23(e)(2)(A).

We have considered whether one lawyer may adequately represent a class made up of members with claims that may

significantly vary.  See Murray v. Grocery Delivery E-Servs. USA Inc., 55 F.4th 340, 346 (1st Cir. 2022) (finding that one lawyer could not represent class members with significantly different claims in the context of allocating a lump-sum settlement); see also Cohen, 16 F.4th at 950-51 (holding that one lawyer could represent class members with potentially conflicting interests where the settlement furthered a significant interest common to, if differently weighted by, all class members).  Here though, Wheatleigh makes no argument that differences among the class members gave rise to any significant differences to be resolved by the settlement.  Rather, Wheatleigh asserts that counsel's conflict arose from the representation of the class on the one hand and the three individual plaintiffs on the other hand.  In short, Wheatleigh contends that the duties counsel owed to the three individual claimants to maximize their recovery conflicted with the duty owed to the class to maximize its recovery.

Wheatleigh did not raise this alleged conflict in its opposition to Mongue's motion for class certification under Rule 23(g).  But it did raise it in opposing enforcement of the global settlement and approval of the class-action settlement.  In any event, the district court has a responsibility "to give careful scrutiny to the terms of the proposed settlement[]" because of potential conflicts of interest that may arise in class actions. In re Pharm. Indus. Average Wholesale Price Litig., 588 F.3d at 36

(quotation marks omitted) (quoting <u>Mirfasihi</u> v. <u>Fleet Mortg. Corp.</u>, 356 F.3d 781, 785 (7th Cir. 2004)); <u>see also</u> <u>In re Warner Commc'ns Sec. Litig.</u>, 798 F.2d 35, 37 (2d Cir. 1986) ("In approving the proposed settlement of a class action, a district court has the fiduciary responsibility of ensuring that the settlement is fair and not a product of collusion, and that the class members' interests were represented adequately."); <u>Grunin</u> v. <u>Int'l House of Pancakes</u>, 513 F.2d 114, 123 (8th Cir. 1975) ("Under Rule 23(e) the district courts acts as a fiduciary who must serve as a guardian of the rights of absent class members."). We thus turn to the key question: Was the court required to find a disqualifying conflict in Morneau's concurrent negotiation of a "global settlement" for all three individual plaintiffs and the Mongue class, and therefore withhold approval of the class-action settlement?

Leading treatises appear to be split on the question of whether counsel may concurrently represent individual plaintiffs and a class against the same defendants. <u>Compare</u> 1 <u>McLaughlin on Class Actions</u> § 4:39 (22d ed. 2025) ("[C]ounsel cannot simultaneously represent a class and prosecute either individual or class claims against the same defendants in a different proceeding, even if there is partial overlap among the plaintiffs or class members in the cases."), <u>with</u> 6 <u>Newberg & Rubenstein on Class Actions</u> § 19:24 (6th ed. 2022) ("Courts have occasionally found counsel inadequate to represent the class [when counsel

simultaneously represents individuals in a parallel action] . . . [but] only in the presence of a real, not speculative, conflict and [mostly] in cases involving potentially limited funds."), 7A Wright & Miller's Federal Practice & Procedure § 1769.1 (4th ed. 2008) (opining that a conflict of interest "may require disqualification" where "class counsel is involved in multiple lawsuits . . . against the same defendants that could result in conflicting interests in their prosecution" but cautioning that "the fact that the counsel is engaged in multiple parallel or overlapping class suits does not, standing alone, establish a conflict"), and Principles of the L. of Aggregate Litig. § 2.07 cmt. d (A.L.I. 2010) (explaining that "[s]tructural conflicts of interest might arise between named parties or other claimants and the lawyers who represent claimants in the aggregate," such as "when those lawyers also represent other persons whose claims would not be subject to aggregate treatment," but instructing that "the court should consider the alignment between the economic interests of claimants and their lawyers" (citation omitted)). And we have found no on-point case law in this circuit or others.

We are not reviewing here the decision to appoint class counsel in the first instance under Rule 23(g), though. Rather, we are reviewing a court order approving a class-action settlement under Rule 23(e)(2), which calls for a retrospective assessment of counsel's representation. Fed. R. Civ. P. 23(e)(2)(A)-(B)

advisory committee's note to 2018 amendment ("[T]he focus at this point is on the actual performance of counsel acting on behalf of the class.").

As the district court explained, class counsel's actual performance offers not a hint of any conflict-induced shortfall in the adequacy of his representation of the class. Counsel secured recoveries for each class member that exceeded the total damages suffered by that class member, surrendering only the possibility of recovering even greater amounts in excess of actual damages. Furthermore, the average percentage excess over actual damages received by class members was almost identical to the average excess received by the three individual plaintiffs who actually asserted and litigated their claims (29% versus 33%). Given these figures, one might even venture that the three individual plaintiffs fared less well than they should, given their active participation in the pursuit of their claims as compared to the passive roles played by class members. But the possibility of any potential conflict running in favor of the class is not a matter of our concern in this context.

We also observe that all forty-three class members were sent written notice of the settlement, and only four notices were undeliverable. The notice made clear that class counsel was also pursuing three individual wage and hour claims against Wheatleigh and could receive additional attorney fees and expenses for those

representations.[5]  Not a single class member opted out or voiced any objection.  While not dispositive, the lack of objections from class members weighs in favor of approving a class-action settlement, at least where, as here, class members stand to recover significant awards.  See 4 Newberg & Rubenstein on Class Actions § 13:58 (6th ed. 2022) (remarking that courts "take note of . . . the proportion of class members who object" and that such objections are more meaningful in large claim cases); 2 McLaughlin on Class Actions § 6:10 (22nd ed. 2025) (noting that many courts consider the "absence of objectors or receipt of a relatively small number of objections" as "support[ing] the conclusion that the settlement is adequate" and that "the significance of the objection

_____

[5]  Specifically, the notice read:

> Class Counsel will ask the Court for attorneys' fees and expenses of up to $92,893.20 for this case.  Class Counsel may also receive additional attorneys' fees and expenses of up to $180,000 for representing three other individuals who brought individual wage and hour claims in the following three lawsuits in the U.S. District Court for the District of Massachusetts: Mark Brown v. The Wheatleigh Corp., et al., Case No. 3:18-cv-30056-KAR; Christian Perreault Hamel v. The Wheatleigh Corp., et al., Case No. 3:18-cv-30113-KAR; and Mary Harris v. The Wheatleigh Corp, et al., Case No. 3:18-cv-30114-KAR.  The Court will decide the collective amount of fees and expenses to award.  Class Counsel will also request that a service award of $5,000.00 be paid to Arleta Mongue, the Class Representative, for her service as representative on behalf of the whole Class.

rate properly may take into account . . . the size of class member claims").

And what would happen were we to decide the class-action settlement should not have been approved?  Nothing in the record provides any reason at all to think that class members would end up better off.

Wheatleigh points out that one of the individual plaintiffs contends that he was misclassified as a manager, which would imply that he should have been included in the tip pool, while class members were simultaneously claiming that too many people were allowed to participate in and take a share of the tip pool.  To the extent this is supported by the record, such a conflict would normally pose a bar to appointing a single lawyer to represent both the individual plaintiff and the class because of the likelihood that the pursuit of one claim could undercut pursuit of the other.  But here, what was presented to the district court was a settlement paying both the individual plaintiff and the class members at least the full amount of wages claimed.  Like the district court, we see no reason why this actual result must be cast aside -- at the behest of Wheatleigh and without a hint of

dissatisfaction from the class itself -- merely because there was the potential for a different result that was never realized.[6]

Nor was the conflict quite as clear as Wheatleigh contends. The individual suits and the class suit would not necessarily have been tried together if not settled. So, it was perfectly possible that inconsistent results could have been pursued and obtained.

Our decision in Murray does not dictate a reversal. In Murray, and not here, a class member objected to a proposed aggregate settlement that would have paid her only a small percentage of the damages to which she claimed entitlement. 55 F.4th at 343. She argued that there was a structural conflict within the class because some members had claims that were quite plausibly stronger than others, yet all members were to receive the same small amount. Id. at 343–44. We held one lawyer could not adequately resolve this conflict among class members because it went to the heart of the suit. Id. at 348. That decision does not control here, where no class member objected to the settlement and all received a payment that exceeded their claimed unpaid wages.

_____

[6] Notably, Wheatleigh does not claim that the settlement agreement results in any individual being paid an amount less than the reasonable settlement value of any claim.

Whether the court should have appointed Morneau class counsel in the first instance had the potential conflict been flagged at the get-go, we need not decide. Instead, we decide only that class counsel's simultaneous representation of three individual claimants with similar claims against the same defendants did not here preclude the district court from approving the class-action settlement.[7]

## IV.

Wheatleigh argues that the district court should have revisited and revoked its order certifying a class in this lawsuit, suggesting among other things that there were too few class members. But Wheatleigh settled the case without preserving any right to challenge certification, and the only interest of class members implicated by Wheatleigh's unreserved arguments are those we have just discussed in connection with our review of the class-action settlement agreement. We therefore have no reason to consider whether the court should have revisited its order certifying a class.

## V.

Finally, Wheatleigh levies a two-pronged attack on the district court's award of attorney fees. It argues that the

---

[7] We therefore need not consider whether Wheatleigh could have reneged on the settlement agreement had the district court required the addition of other counsel before approving the agreement.

district court erred by (1) awarding disproportionately high attorney fees, considering the individual and class claims in tandem; and (2) including in its lodestar calculation the hours worked by co-counsel, when co-counsel neither filed a notice of appearance nor signed any filings.[8]

We "review[] a district court's determination regarding attorney[] fees only for a mistake of law or abuse of discretion." Heien v. Archstone, 837 F.3d 97, 100 (1st Cir. 2016). Aside from mistakes of law, which always constitute abuses of discretion, we will set aside a fee determination "only if it clearly appears that the trial court ignored a factor deserving significant weight, relied upon an improper factor, or evaluated all the proper factors (and no improper ones), but made a serious mistake in weighing them." Id. (cleaned up).

**A.**

At the outset, we question whether Wheatleigh has standing to challenge the fee award. All the fees awarded came out of the agreed-upon lump sum, so no reduction or allocation of

---

[8] The court considered these hours when calculating the lodestar figure against which the attorney fee award sought by class counsel was compared to determine its reasonableness. See infra § V(B). Wheatleigh does not contend that co-counsel was directly compensated by the court for his work, nor does the record support such a conclusion. As discussed infra, the court ultimately approved attorney fees that were "significantly" lower than the lodestar figure, even when co-counsel's fees were subtracted from the lodestar.

the fees awarded could have affected Wheatleigh. Nevertheless, as is often the case, a fee request in a class action raises interests of class counsel that are opposed to interests of the class members, and, as a belt-and-suspenders approach, we explain why we find Wheatleigh's claim of error regarding the fee award unconvincing.

**B.**

We begin by assessing the reasonableness of the awarded attorney fees. This circuit has recognized two methods of calculating appropriate attorney fees: the lodestar method, which involves "determining the number of hours productively spent on the litigation and multiplying those hours by reasonable hourly rates," and the percentage of funds (POF) method, in which "the court shapes the counsel fee based on what it determines is a reasonable percentage of the fund recovered for those benefitted by the litigation." In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 305 (1st Cir. 1995).

In its preliminary approval order, the district court noted that, while the requested $92,893.20 in attorney fees for the class-action settlement represented only 27.2% of the $341,812 allocated toward settlement of the class claims, "taking into consideration the three Individual Cases as well as this case, Class Counsel would be recovering $272,893.20, which represents

49.6% of the total [Gross Settlement Fund]." It therefore announced its intention to "scrutinize the high POF Class Counsel is seeking to recover" at the fairness hearing and requested that class counsel include "a lodestar analysis with appropriate accompanying documentation."

After receiving the lodestar analysis, the court concluded in its final approval order that the attorney fees were reasonable. It laid out its reasoning in detail. Applying the POF method, the court held that the requested attorney fees (27.2% of the class members' recovery) "fall[] within the range of percentages typically approved." See, e.g., Ark. Tchr. Ret. Sys. v. State St. Bank & Tr. Co., 527 F. Supp. 3d 40, 54 (D. Mass. 2021) (explaining that "frequently an appropriate award is found to be in the 20 to 30% range, but it is usually less if the common fund is more than $250,000,000"). It noted that all but four members of the 43-person class would receive 129% of their alleged damages, which it deemed a "significant" recovery. It observed that no class members had opted out of or objected to the settlement, even after receiving notice of the combined attorney fees that class counsel would recover. And it found that class counsel was experienced; spent nearly six years litigating this case, including identifying the class claims, prevailing on a motion for leave to file an amended complaint in order to bring them, obtaining class certification, filing and opposing motions for

summary judgment, seeking "court enforcement of a settlement that [Wheatleigh] tried to avoid," and seeking preliminary and final approval of a settlement "over [Wheatleigh's] continuing objections"; and assumed the risk of not getting paid at all. Finally, the court found that the fees sought were "significantly" lower than the lodestar calculations, which totaled $189,244.40. Wheatleigh did not dispute the reasonableness of the hourly rate or hours expended in the time records class counsel submitted.

Nor did the attorney fees awarded in the individual settlements alter the court's view of the class fee award's reasonableness. The district court noted that, while the $60,000 in attorney fees per individual case significantly exceeded the amount each individual plaintiff would recover on their FLSA claims, that fee award still fell short of the lodestar amount in each case. And a requirement that FLSA attorney fees be proportionate to recovery amounts would arguably be at odds with the statute's broad remedial purpose, by preventing low-wage workers from securing competent legal counsel. See Fisher v. SD Prot. Inc., 948 F.3d 593, 603 (2d Cir. 2020) ("By implementing a percentage cap on attorney[] fees in FLSA actions, district courts impede Congress's goals by discouraging plaintiffs' attorneys from taking on 'run of the mill' FLSA cases where the potential damages are low and the risk of protracted litigation high."); cf. City of Riverside v. Rivera, 477 U.S. 561, 576 (1986) ("A rule that limits

attorney[] fees in civil rights cases to a proportion of the damages awarded would seriously undermine Congress' purpose in enacting [civil rights laws with fee-shifting statutes]."). Moreover, each of the individual plaintiffs recovered 100-150% of their single damages, which the district court found was a "substantial recovery in line with the 129% recovery of the members of the Class."

Notably, Wheatleigh did not appeal the orders approving the individual FLSA settlements, so it is unclear whether the reasonableness of those particular fee awards is properly before us. Nor does Wheatleigh point to any improper factor considered, significant factor ignored, or mistake in weighing the factors in the district court's analysis. Heien, 837 F.3d at 100. We thus ascertain no abuse of discretion in the district court's carefully reasoned analysis assessing the award of attorney fees in either the class action or the individual claims. Certainly, the percentage of recovery allocated to attorney fees, when considered in the aggregate, may appear steep. But that will necessarily often be the case when the absolute size of the merits claim is small. Given the significant recovery obtained for plaintiffs and class members, the lack of objection from any class members to the settlement arrangement, and the fact that the attorney fees fall short of the aggregate lodestar amount, we see no basis for

concluding that the district court erred in approving the fee determination.

## C.

We now turn to Wheatleigh's assertion that the court erred by awarding attorney fees on account of work performed by lawyers assisting class counsel. We need not linger on this point. Wheatleigh cites no legal authority for the proposition that class counsel was required to disclose before seeking fees the identity of all lawyers working on the case, at least in the absence of a need to clear any conflict peculiar to any such lawyer.

Wheatleigh also argues that the nondisclosure of co-counsel to the district court hampered the court's ability to assess whether class counsel has adequately represented the class. See Fed. R. Civ. P. 23(e)(2)(A). But here, too, Wheatleigh marshals no supporting legal authority. In any case, the district court appears to have dispelled any concern about the adequacy of co-counsel's representation in its final approval order, in which it stated that "[i]n the court's experience, [co-counsel's firm] is a very reputable Berkshire County law firm that provides highly competent representation to its clients." What further clinches the matter is the district court's finding that class counsel's lodestar, even excluding any of the hours attributable to co-counsel, significantly exceeded the attorney fees requested.

- 31 -

Thus, we decline to disturb the district court's approval of attorney fees on this basis.

Because we find the district court's analysis persuasive, we affirm its award of attorney fees.

**VI.**

For the foregoing reasons, we <u>affirm</u> the district court's judgment.